# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-00209-RM-NYW

CHURCH MUTUAL INSURANCE COMPANY, a Wisconsin corporation,

     Plaintiff,

v.

PHILLIP MARSHALL COUTU, an individual,
POWER ADJUSTERS, INC., a Colorado corporation,
JUDAH LEON BENSUSAN, an individual, and
ATLANTIS CLAIMS SERVICES, LLC, a Florida limited liability company,

     Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Magistrate Judge Nina Y. Wang

     This matter is before the court on the Joint Motion To Dismiss ("Motion to Dismiss" or "Motion") filed by Defendants Phillip Marshall Coutu ("Mr. Coutu"), Power Adjusters, Inc. ("Power Adjusters"), Judah Leon Bensusan ("Mr. Bensusan"), and Atlantis Claims Services, LLC's ("Atlantis") (collectively, "Defendants"). [#65,[1] filed June 5, 2017]. The undersigned considers the Motion pursuant to 28 U.S.C. § 636(b), the Order Referring Case dated March 30, 2017 [#33], and the memorandum dated June 5, 2017 [#66]. Upon careful review of the Motion and associated briefing, the entire case file, applicable law, and the comments offered at the September 7, 2017 Motion Hearing, this court respectfully RECOMMENDS that the Motion to Dismiss be GRANTED IN PART and DENIED IN PART for the reasons stated herein.

---

[1] [#_] is an example of a convention this court uses when referring to documents in the instant matter, whereas [ECF. No. _] is a convention the court uses to refer to documents in other proceedings. Further, when citing to a transcript, this court uses the ECF docket number, but cites to the page and line numbers as assigned in the original transcript.

# BACKGROUND

The following facts are drawn from the First Amended Complaint & Jury Demand ("FAC") [#49], and are presumed to be true for the purposes of the instant Motion. Plaintiff Church Mutual Insurance Company ("Plaintiff" or "Church Mutual") is a Wisconsin corporation with its principal place of business in Merill, Wisconsin, and is licensed to issue property and casualty insurance to individuals and companies located in Colorado. [#49 at ¶ 1]. Mr. Coutu is a resident of Florida who holds a non-resident public adjuster license in Colorado, and allegedly owned, operated, controlled, or was otherwise employed by or involved with Power Adjusters, a Colorado corporation. [*Id.* at ¶¶ 2–3, 5]. Mr. Bensusan, a resident of Colorado, once held a Colorado resident public adjuster's license in Colorado, and allegedly owned, operated, controlled, or was otherwise employed by or involved with Atlantis Claims, a Florida limited liability company. [*Id.* at ¶¶ 4, 6–8]. Both Power Adjusters and Atlantis Claims provide services to "policyholders in connection with disputes with insurance companies." [*Id.* at ¶¶ 5, 8].

As relevant here, Church Mutual issued Policy No. 0226224-02-92707 (the "Policy") to Montview Boulevard Presbyterian Church ("Montview") for a period of July 27, 2009, through July 27, 2012. [*Id.* at ¶¶ 14–15]. On May 5, 2012, Montview submitted Claim No. 1186476 (the "claim") to Church Mutual for benefits owed under the Policy to recover roof repair costs incurred following a wind and hailstorm. [*Id.* at ¶ 16]. On or about September 11, 2012, Plaintiff remitted $41,183.44 to Montview under the claim—Plaintiff then remitted an additional $48,397.92 under the claim to Montview on or about February 12, 2013. [*Id.* at ¶¶ 17–18].

While Plaintiff continued to adjust the claim, Montview hired Mr. Coutu and Power Adjusters as its public adjuster to represent it in the adjustment of the claim on October 10, 2012. [*Id.* at ¶ 19]. Mr. Coutu allegedly entered into a "consulting" agreement with Integrity Roofing,

Montview's roofing contractor, at this same time but did not disclose the existence of this agreement with Plaintiff. [#49 at ¶ 19]. At some point, Plaintiff proposed that an independent adjuster visit Montview's property to conduct a re-inspection in the presence of a contractor and engineer to assess the alleged damage; however, Mr. Coutu allegedly refused to participate and instead sought to have a personal meeting with the independent adjuster. [*Id.* at ¶ 21].

Mr. Coutu then indicated that he would go directly to the appraisal process, despite Plaintiff's ongoing adjustment of the claim, and, in accordance with Mr. Coutu's urging, Montview issued a written demand, via email, for appraisal (the "Appraisal Demand") on or about January 23, 2013. [*Id.* at ¶¶ 21–22, 24]. The Appraisal Demand named Mr. Bensusan of Atlantis Claims as the purported impartial appraiser under the Policy's appraisal clause. *See* [*id.* at ¶¶ 23–24]. On January 31, 2013, Plaintiff acknowledged and accepted the Appraisal Demand and nominated William McConnell, P.E. as its appraiser. [*Id.* at ¶ 25]. Mr. McConnell also agreed to Mr. Bensusan's nomination of John Kezer, Esq. of Jones & Keller, P.C. to serve as the umpire. *See* [*id.* at ¶ 26].

On or about September 30, 2013, an appraisal award issued for $268,168.54 (the "Appraisal Award"). [*Id.* at ¶ 26]. Then, on or about October 11, 2013, Church Mutual remitted $154,410.68 to Montview as an actual cash value payment under the claim and the Appraisal Award. [*Id.* at ¶ 29]. That same day, Montview's facilities manager Bob Cloud, met with Messrs. Coutu and Bensusan as well as Integrity Roofing to discuss the Appraisal Award and to divide the proceeds. [*Id.* at ¶ 32]. Allegedly, at this meeting, Mr. Cloud first learned that Mr. Bensusan's compensation was a percentage of the Appraisal Award, not an hourly fee. [*Id.* at ¶¶ 33, 49]. According to Plaintiff, Messrs. Coutu and Bensusan have a *de facto* partnership amongst themselves, Power Adjusters and Atlantis Claims, and with Mr. Kezer. *See* [*id.* at

¶¶ 35–45]. Plaintiff then remitted an additional $14,176.50 as recoverable depreciation under the claim on November 1, 2013. [*Id.* at ¶ 30].

On or about May 1, 2014, Montview filed a complaint against Church Mutual in the District Court for the City and County of Denver, later removed to the District of Colorado, asserting claims for common law bad faith breach of an insurance contract as well as violations of Colo. Rev. Stat. §§ 10-3-1115, -1116 ("statutory bad faith") related to the claim. [*Id.* at ¶¶ 46–48]. Church Mutual asserted a counterclaim against Montview, seeking to vacate the Appraisal Award given, *inter alia*, Mr. Bensusan's undisclosed financial interest in the outcome of the appraisal. [*Id.* at ¶¶ 50–51]. Ultimately, Church Mutual and Montview settled their case, but Plaintiff alleges that it suffered damages defending against the action—the action Messrs. Coutu and Bensusan urged Montview to file and which both stood to gain from financially. [*Id.* at ¶¶ 56–58]. Moreover, Plaintiff alleges that Messrs. Coutu and Bensusan actively concealed the nature of their financial and business relationships, despite an independent duty to disclose this information. *See* [*id.* at ¶¶ 59–71, 72–88, 92–93]. Further, that these misrepresentations of material facts would have relieved Church Mutual from any payment obligations under the Policy, *see* [*id.* at ¶¶ 70–71], and that Messrs. Coutu and Bensusan seek additional compensation by urging policyholders to file suit against Church Mutual for delaying and/or withholding benefits and, in doing so, have committed mail and wire fraud. [*Id.* at ¶¶ 92–93, 96, 97–104].

Plaintiff initiated this action by filing its Complaint in this District on January 23, 2017. [#1]. Plaintiff's Complaint alleged two claims against the Defendants: (1) civil conspiracy and (2) fraudulent concealment. [*Id.*]. Following several extensions of time to answer or otherwise respond to Plaintiff's Complaint, *see, e.g.*, [#20; #25; #29; #38], and prior to the Rule 16(b) Scheduling Conference, the undersigned granted the Parties' request to set a deadline of April

25, 2017, for Plaintiff to file its FAC, and granted Defendants one final extension of May 16, 2017, to answer or otherwise respond to Plaintiff's FAC.  *See* [#46].  Plaintiff filed its FAC on April 25, 2017, and levied several new claims against Defendants.  The operative claims in this matter are:  (1) civil conspiracy against all Defendants ("Claim I"); (2) fraudulent concealment against all Defendants ("Claim II"); (3) federal civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against all Defendants ("Claim III"); (4) federal civil RICO conspiracy against Messrs. Coutu and Bensusan ("Claim IV"); and (5) state civil violations of the Colorado Organized Crime Control Act ("COCCA") against Messrs. Coutu and Bensusan ("Claim V").  [#49].

The undersigned then held a Status Conference on May 10, 2017, setting a Scheduling Conference for June 23, 2017.  [#56].  On June 5, 2017, Defendants filed the instant Motion to Dismiss directed at all five claims [#65], as well as a Motion to Stay discovery [#64] that the undersigned denied.  *See* [#103].  Plaintiff then filed a Response [#95], and Defendants filed a Reply.[2]  [#110].  On September 7, 2017, the undersigned held a Motion Hearing on the Motion to Dismiss, and took the Motion under advisement.  [#115].  Because the Motion is ripe for Recommendation, this court considers the Parties' arguments below.[3]

---

[2]  Defendants filed two versions of the Reply on August 8, 2017.  *See* [#109; #110].  At oral argument, counsel for Mr. Coutu and Power Adjusters explained that the second, Amended Joint Reply Re: Motion to Dismiss [#110] was the correct Reply for this court's consideration.

[3]  At oral argument, Plaintiff presented both Defendants' counsel and the court with a presentation entitled "Argument on Defendants' Motion to Dismiss – September 7, 2017" that included both case authority and exhibits that had not been previously identified by Plaintiff or disclosed during briefing.  Counsel for Defendants Coutu and Power Adjusters objected, indicating that it had not received prior notice of the authority or additional documents, and counsel for Plaintiff suggested that the court could consider these additional materials as Defendants could have accessed such information because they understood what issues Plaintiff was raising and what prior cases Plaintiff alleged formed the backbone of the civil conspiracy claims.  This court respectfully disagrees that it would be appropriate for it to consider the newly introduced authority or information.  Neither the Federal Rules of Civil Procedure nor the Local

## LEGAL STANDARD

Under Rule 12(b)(6) a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."[4] *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Nevertheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible."). The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

---

Rules of Civil Practice for this District contemplate any type of sur-reply. Plaintiff also did not seek leave of court to supplement its papers with additional authority or documents, or the Power Point presentation offered at the hearing. There is no argument that these documents were identified to Defendants during the briefing on this instant Motion. Accordingly, the court will not consider any document that was not submitted as an exhibit to the filed motion papers, as they are not properly before the court.

[4] However, the court may consider materials outside the complaint without converting a motion to dismiss to one for summary judgment if the documents are central to the plaintiff's claims, referred to in the complaint, and if the parties do not dispute their authenticity. *See Cty. of Santa Fe, N.M. v. Public Serv. Co. of N.M.*, 311 F.3d 1031, 1035 (10th Cir. 2002).

**ANALYSIS**

**I.      Fraudulent Concealment – Claim II**[5]

Under Colorado law,[6] to plead a plausible fraudulent concealment claim Church Mutual must allege that:  (1) Defendants concealed a material fact that in equity and good conscience should have been disclosed; (2) Defendants knew it was concealing such a fact; (3) Plaintiff was ignorant to the concealed fact; (4) Defendants intended Plaintiff to act upon the concealed fact; and (5) Plaintiff acted on the concealed fact to its detriment.  *See Wood v. Houghton Mifflin Harcourt Publ'g. Co.*, 589 F. Supp. 2d 1230, 1254 (D. Colo. 2008) (applying Colorado law); *Baker v. Wood, Ris & Hames, Prof'l Corp.*, 364 P.3d 872, 883 (Colo. 2016).  The indispensible component of a fraudulent inducement claim is that the tortfeasor owed the plaintiff a duty to disclose material information yet neglected that duty.  *See Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111 (Colo. 1998) ("A defendant has a duty to disclose to a plaintiff with whom he or she deals material facts that in equity or good conscience should be disclosed." (internal quotation marks and citation omitted)).  "The question of whether a duty exists is a question of law."  *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1163 (10th Cir. 2008) (internal quotation marks and citation omitted).

---

[5]  Because Plaintiff predicates its civil conspiracy claim (Claim I) on Defendants' alleged conspiracy to fraudulently conceal material information, *see* [#49 at ¶ 105], this court considers Claim II first.  This is because conspiracy is a derivative cause of action that is not independently actionable; that is, "[i]f the acts alleged to constitute the underlying wrong provide no cause of action, then there is no cause of action for the conspiracy itself."  *Double Oak Const., L.L.C. v. Cornerstone Dev. Int'l, L.L.C.*, 97 P.3d 140, 146 (Colo. App. 2003) (internal quotations and citations omitted).  Thus, the viability of Claim I necessarily hinges on whether Plaintiff has alleged a plausible fraudulent concealment claim.

[6] Because this is a diversity action, this court applies Colorado substantive law to the common law claims.  *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1539 (10th Cir. 1996).

The issue here is whether Defendants owed Plaintiff such a duty under the circumstances of this case—a question that appears unanswered in Colorado and in this District. *See Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1223 (10th Cir. 2016) (noting that when jurisdiction is based on the parties' diversity, the federal court must predict how the state's highest court would rule on a question of substantive law if the state's highest court has yet to do so). The Parties offer diametrically opposed views on this point: Plaintiff argues that a duty unequivocally exists under Colorado common law, wholly apart from the insurance contract entered between Church Mutual and Montview, whereas Defendants contend that there is no such duty and that this fact is fatal to the entire FAC. *Compare* [#65; #110] *with* [#95]. Additionally, Defendants aver that, even if they owed Plaintiff such a duty, Colorado's economic loss rule bars Claim II because the allegedly breached duty arose from the Policy. *See* [#65 at 14–18, 21; #110 at 15–17].

### A.    Agency

Before addressing these arguments, this court first addresses an issue interwoven, and at times conflated, throughout the Parties' positions. Throughout their Motion to Dismiss, Defendants argue that, because they are Montview's agents, their alleged unsatisfactory performance under the Policy (i.e., their partiality) insulates them from Plaintiff's fraudulent concealment claim. *See* [#65 at 11–14, 20–21]. Rather, Plaintiff's sole remedy was to deny Montview's appraisal award based on this alleged misconduct. *See generally* [*id.*]. Plaintiff responds that Defendants breached a duty to disclose owed to Plaintiff, because Defendants, even as Montview's agents, are liable for their own tortious conduct. [#95 at 23–27]. Plaintiff also contends that without such an independent duty, their only recourse would be to penalize the innocent insured. [*Id.* at 14]. Defendants generally agree with this proposition, but argue that these conclusions do not create an independent duty to disclose material facts to Plaintiff. [#110

at 13–14]. At oral argument, Defendants continued to insist that as agents of a party to an insurance contract, they cannot be independently liable for breach of contract. *See, e.g.*, [#119 at 6:4–10, 6:23–7:13]. This court finds Defendants' arguments misplaced.

As an initial matter, as recognized by Plaintiff, there is a distinction between the role of a public adjuster and an appraiser—a distinction that this court finds to be important to discuss even if it is not dispositive of the issues before it. A public adjuster is an adjuster employed by an insured to assist the insured in making a claim to its insurer. *See* Colo. Rev. Stat. § 10-2-103(8.5); *Colorado Hosp. Servs. Inc. v. Owners Ins. Co.,* No. 14-CV-001859-RBJ, 2015 WL 4245821, at *2 (D. Colo. July 14, 2015). Therefore, a public adjuster is considered an agent of the insured. *See Republic Ins. Co. v. Jernigan*, 753 P.2d 229, 231 (Colo. 1988) (describing a public adjuster as an agent of the insured). But it is not clear that an appraiser selected under the Policy is an agent of the insured. "Agency 'is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *Mullin v. Hyatt Residential Grp., Inc.*, 82 F. Supp. 3d 1248, 1258 (D. Colo. 2015) (quoting *Stortroen v. Beneficial Fin. Co. of Colorado*, 736 P.2d 391, 395 (Colo. 1987)). Defendants cite no authority, and this court could find none, that an appraiser, who is required to be "impartial" under the Policy, would be appropriately considered an agent of the insured. *Cf. Norwich Union Fire Ins. Soc., Ltd., of Norwich, England v. Cohn*, 68 F.2d 42, 44 (10th Cir. 1933) ("But while appraisers are appointed by the parties, they are not subject to the control of the parties. They are not agents in law and ought not to be in practice. If appraisers were subject to the direction of the parties, the whole proceeding would be a useless ceremony . . . ." (internal citations omitted)).

Even assuming an appraiser could be appropriately considered an agent of the insured, Defendants may still be liable for their tortious actions independently. It is well-settled that "[a] principal may be bound by an agent's actions if the agent acts pursuant to either actual or apparent authority, regardless of whether the principal has knowledge of the agent's conduct." *Citywide Banks v. Armijo*, 313 P.3d 647, 652 (Colo. App. 2011). "However, an agent may be held personally liable for torts committed by him including his own misrepresentations, even though the tortious acts were done on behalf of his principal." *Galie v. RAM Assocs. Mgmt. Servs., Inc.*, 757 P.2d 176, 177 (Colo. App. 1988); *accord* RESTATEMENT (THIRD) OF AGENCY § 7.01 ("An agent is subject to liability to a third party harmed by the agent's tortious conduct."). While Defendants may not be liable for any breach by Montview of the Policy, Defendants can be liable for their own tortious conduct, even for acts conducted as Montview's agents. This court understands Plaintiff to be arguing that Defendants owed it a duty to disclose certain material facts outside of any contractual duty imposed by the Policy that Montview to select an independent and impartial appraiser.

This court now turns to the more difficult question of whether an extra-contractual duty to disclose particular financial information ran from Defendants to Plaintiff under the circumstances.

**B.    Duty**

Church Mutual asserts that Defendants owed it a duty to disclose their financial and business relationships, Mr. Bensusan's financial interest in the Appraisal Award, and their financial interest in any damages awarded to Montview in the underlying litigation between Plaintiff and Montview. *See, e.g.*, [#49 at ¶¶ 59–67, 72, 111a.–j.]. Plaintiff asserts that this duty to disclose emanates from the common law, the Policy, Colorado statutes, and Colorado

regulations. [*Id.* at ¶¶ 72–88]. Defendants move to dismiss Claim II on the basis that they owed Plaintiff no duty to disclose this information under the common law, the Policy, Colorado's statutes and regulations, or otherwise. *See* [#65 at 11–14, 18–23; #110 at 5–15]. For the following reasons, this court respectfully concludes that Defendants' owed Plaintiff a duty to disclose their financial and business relationships under the particular circumstances of *this case*.[7]

### 1. Common Law Duty

#### a. Nature of the Relationship

The court first considers Defendants' argument that there is no, and can be no, common law duty that runs between Defendants[8] and the insurance company because of the nature of the relationship. In making these arguments, Defendants primarily rely on two cases that this court finds non-dispositive under these circumstances.

First, in *Building On Our Best LLC v. Sentinel Insurance Company Limited*, the court did not directly consider whether a public adjuster or appraiser owed any duty to an insurance company. Instead, the court dismissed the plaintiffs' Colorado Consumer Protection Act ("CCPA") claim against the engineering company hired by the insurer's adjuster, because the plaintiffs (as insureds) could not establish that the engineering company's conduct had a public

---

[7] Defendants argue in their Reply that Church Mutual's appraiser selected Mr. Kezer as the Umpire out of a list of six potential candidates, that all three members of the appraisal panel signed the Appraisal Award, and that the FAC contains no allegation that Defendants "provided a false written statement regarding the scope and extent of Montview's physical hail damage," *see* [#110 at 8–9, 12], but these arguments go to the remaining elements of Claim II, i.e., causation and damages, that are not at issue before this court on the instant Motion that is limited to the issue of whether an independent duty exists. Further, consideration of these issues requires factual inquiries that are inappropriate at this stage. Accordingly, this court does not address these additional arguments.

[8] Again, Defendants draw no distinction between the various responsibilities of a public adjuster or appraiser.

impact on its *customers* (i.e., the insurance company), and did not allege a factual basis to demonstrate that the engineering company's "phony engineering reports" amounted to anything more than a bias in favor of insurers, which does not constitute an unfair and deceptive trade practice under the CCPA. No. 15-cv-00669-RBJ, 2015 WL 7014445, at *4–5 (D. Colo. Nov. 12, 2015). In reaching this conclusion, the *Building On Our Best* court observed that bias on the part of the engineering company toward the insurer did not constitute an unfair or deceptive trade practice, "any more than an insured's retention of a 'public adjuster' known to be favorable to the insured would necessarily establish actionable wrongdoing on the public adjuster's part." *Id.* at *4.

Defendants urge this court to construe the *Building On Our Best* court's ruling as one that establishes that a public adjuster or appraiser has no duty to a third party, but such a conclusion is not warranted. As an initial matter, the court's observation is just that—an observation—and not a legal holding that a public adjuster owes no duty to anyone other than his client under all circumstances. Instead, the *Building On Our Best* decision is more applicable to Mr. Bensusan's as an appraiser selected by the public adjuster, but still not dispositive. The court in *Building On Our Best*, and in other cases, observed that repeated engagement of an expert alone is not a basis to conclude that the expert is impermissibly biased. *See id.* at *5; *Colorado Hosp. Servs. Inc.*, 2015 WL 4245821, at *2. But Plaintiff's allegations in this matter exceed an assertion of mere bias. Rather, Plaintiff alleges that Defendants had an independent duty to disclose their financial and business interests in the outcome of the particular Appraisal Award and the underlying Montview litigation, and that Defendants' failure to do so caused it the specific injuries of paying "more than it otherwise would have paid had the appraisal award not involved an undisclosed conflicted appraiser (Bensusan). . . . [and] significant attorneys' fees defending the Underlying

Action and bringing counterclaims in the Underlying Action, which it would not have had to do had the Defendants not engaged in their fraudulent conspiracy." [#49 at ¶ 58]. Thus, Plaintiff avers that Defendants withheld information regarding a direct pecuniary interest to Plaintiff's detriment.

In further contrast to *Building On Our Best*, where the court found that the Amended Complaint set forth no factual allegations to support the plaintiffs' belief that the engineering report was "assembled in bad faith," reliant upon "inaccurate data and irrelevant sources, and was created for the sole purpose of misleading Plaintiffs to believe that Sentinel's denial was justified," *see* 2015 WL 7014445, at *4–5, the FAC in this action alleges specific facts to support its assertions of material omissions about Mr. Bensusan's motive and incentive to increase the Appraisal Award. For example, Mr. Bensusan's compensation was not hourly but, rather, a percentage of the Appraisal Award [#49 at ¶ 33]; Messrs. "Coutu and Bensusan had an undisclosed agreement whereby Bensusan was compensated, either directly or indirectly, from the proceeds of the appraisal awards in numerous appraisals or litigated bad faith cases where Bensusan had been appointed as appraiser by Coutu (or appointed by the insured at Coutu's suggestion)" [*id.* at ¶ 35]; from at least January to September 2013, Mr. Bensusan had check writing, deposit, and fund withdrawal authority from Mr. Coutu's company bank account [*id.* at ¶ 36]; in that same time period, Mr. Bensusan held an equitable interest in Mr. Coutu's company, Power Adjusters [*id.* at ¶ 37]; also in that same time frame, Power Adjusters paid for Mr. Bensusan's personal residence in the tune of tens of thousands of dollars [*id.* at ¶ 39]; and that the various actors concealed these facts to create the false impression that Mr. Bensusan was an independent and impartial appraiser, thereby allowing Defendants to improperly inflate the Appraisal Award to Plaintiff's detriment [*id.* at ¶ 70]. While this court concurs that a particular

predisposition toward one side or another in litigation is, in itself, unlikely to be actionable, Plaintiff's allegations, taken as true, plead more than garden-variety bias. Rather, the FAC articulates specific facts to support the conclusion that Defendants had an ongoing financial relationship that incentivized and facilitated an inflated Appraisal Award, and Defendants did, in fact, reap excessive financial gains at Plaintiff's expense. Accordingly, this court finds that *Building On Our Best* does not support the conclusion that a public adjuster or appraiser can never owe a duty to an insurance company.

Next, in *Meridian Security Insurance Company v. Hoffman Adjustment Company*, the Indiana Court of Appeals held that, under Indiana agency law, the insurer-plaintiff could not hold the insureds' public adjuster, as the insureds' agent, liable for alleged fraud and breach of contract. 933 N.E.2d 7, 12–13 (Ind. Ct. App. 2010). Though somewhat factually similar, and despite Defendants' fervent attempt to persuade this court to reach a similar outcome here, *Meridian* is inapposite. *Meridian* is based on <u>Indiana</u> principles of agency law that do not hold agents economically liable to anyone but their principals. *Id.* at 12 (citing *Greg Allen Const. Co., Inc. v. Estelle*, 798 N.E.2d 171, 174 (Ind. 2003)). But as explained, an agent can be liable to parties other than its principal for its tortious conduct under <u>Colorado</u> law. *See Galie*, 757 P.2d at 177. Further, the court in *Meridian* emphasized that Meridian predicated its claims on trying to hold the public adjuster liable for acts that breached the policyholders' insurance policy. As explained in more detail below, if Church Mutual's only allegations were that Defendants breached the Policy's "impartial appraiser" language by having multiple engagements together, then this court would likely conclude that such claims were barred, given Defendants' status as non-parties to the Policy and the conclusion by multiple courts that "[t]he suggestion that retention of an expert on multiple engagements renders the expert other than impartial is a

slippery slope." *Colorado Hosp. Servs. Inc.*, 2015 WL 4245821, at *2 n. 2. Here, however, there is a different dimension—Defendants tortiously withheld material information regarding their pecuniary interests in the Appraisal Award and the underlying Montview litigation that they were required to disclose in addition to any duties arising under the Policy.

### b.    Section 551(2) & Colorado Jury Instructions

More salient is Defendants' argument that neither RESTATEMENT (SECOND) OF TORTS § 551(2) nor Colorado's jury instructions support Plaintiff's allegation that Defendants owed a duty to disclose material information regarding their financial interests to Church Mutual under the circumstances. [#110 at 11]. Defendants contend that the only possible obligation for an appraiser to be fair and impartial emanates from the Policy, and as non-parties to the Policy, they cannot have an independent "duty to speak." [*Id.* at 11–12]. Plaintiff argues that both section 551(2) and Colorado's jury instructions impose a duty to disclose on Defendants, because Defendants knew of matters that rendered their statements misleading and the "customs of the trade" required Messrs. Coutu and Bensusan to disclose their partiality. [#95 at 17–18].

Generally, "'[a] defendant has a duty to disclose to a plaintiff with whom he or she deals material facts that in equity or good conscience should be disclosed.'" *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1109 (10th Cir. 2009) (quoting *Mallon Oil Co.*, 965 P.2d at 111). This may arise "when one party has information that the other is entitled to know because of a . . . relation of trust and confidence between them." *F.D.I.C. v. Refco Grp., Ltd.*, 989 F. Supp. 1052, 1082 (D. Colo. 1997) (internal quotation marks and citation omitted); *see also European Motorcars of Littleton, Inc. v. Mercedes-Benz USA, LLC*, No. 17-CV-00051-MEH, 2017 WL 2629133, at *10 (D. Colo. June 19, 2017) (collecting Colorado cases finding a special relationship between parties that work closely with and rely on one another often). Such a duty may also arise under

the circumstances of a particular case pursuant to RESTATEMENT (SECOND) OF TORTS § 551(2).

*See Sussman v. Stoner*, 143 F. Supp. 2d 1232, 1239 (D. Colo. 2001) (citing *Mallon Oil Co.*, 965

P.2d at 111 (utilizing section 551(2) as a guidepost for determining whether a duty to disclose

existed); *cf.* Colo. Jury Instr., Civil 19:2 (listing the elements of liability for fraudulent

concealment), 19:5 (defining the contours of circumstances that create a duty to disclose).

    As relevant here, section 551(2) provides:

> One party to a business transaction is under a duty to exercise reasonable care to
> disclose to the other before the transaction is consummated,
> . . .
> (b) matters known to him that he knows to be necessary to prevent his partial or
> ambiguous statement of the facts from being misleading;
> . . .
> (e) facts basic to the transaction, if he knows that the other is about to enter into it
> under a mistake as to them, and that the other, because of the relationship between
> them, the customs of the trade or other objective circumstances, would reasonably
> expect a disclosure of those facts.

RESTATEMENT (SECOND) OF TORTS § 551(2)(a)–(e) (AM. LAW INST. 1977); *accord* Colo. Jury

Instr., Civil 19:5 (tracking the Restatement's language).

    This court is not persuaded that section 551(2) or Colorado's jury instructions are

inapplicable simply because Defendants were not parties to the Policy. *See* [#65 at 13; #110 at

9–10]. First, Defendants point this court to no support for their proposition that section 551(2)

applies only to the transaction forming the Policy, but not to the appraisal process. Pursuant to

section 551(2)(b), a defendant has a duty to disclose when she knows of matters that would be

necessary to prevent her partial or ambiguous statements from being misleading. RESTATEMENT

(SECOND) OF TORTS § 551(2)(b) (AM. LAW INST. 1977). Comment g explains that a statement

may be partial or incomplete so as to be misleading if it purports to tell the whole truth and does

not. *Id.* cmt. g (AM. LAW INST. 1977). Under such circumstances, a duty to disclose additional

information arises to avoid misleading the recipient. *Id.*; *cf. Level 3 Commc'ns, LLC*, 535 at

1164 (holding that the defendant had a duty to disclose when the contract ambiguously referred to batteries as "new," because the term could represent either brand-new batteries or different batteries from those in the plaintiff's previous order). At least one division of the Colorado Court of Appeals has observed that a third-party administrator of an insurance contract, who was not a party to the contract, owed the insured a duty of good faith and fair dealing in processing an insurance claim when the administrator performed the functions of an insurer and had a financial incentive to limit the insured's claims. *See Riccatone v. Colorado Choice Health Plans*, 315 P.3d 203, 206–07 (Colo. App. 2013) (citing *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003)). That duty flows from the insurer's obligation of good faith and fair dealing. *See id.* Though not precisely on point, the holding of *Riccatone* supports the conclusion that, under Colorado law, a third party to the contract may have duties derivative of the insurance policy that are separate and cognizable.

Here, the FAC alleges that Mr. Coutu, in urging Montview to select Mr. Bensusan as the appraiser who then selected Mr. Kezer as the umpire, represented (through his actions or words) that both were independent and impartial—a fact made misleading by Defendants' failure to disclose the financial and business relationships and interests amongst them. *See Konold v. Baskin-Robbins, Inc.*, 87 F.3d 1327 (table), 1996 WL 346607, at *3 (10th Cir. Jun. 25, 1996) (unpublished) (stating, "a defendant 'has a duty to disclose if he has stated facts that he knows will create a false impression unless other facts are disclosed.'" (quoting *Burman v. Richmond Homes, Ltd.*, 821 P.2d 913, 918 (Colo. App. 1991)). Once selected, Mr. Bensusan also did not disclose and concealed the fact that he was paid a percentage of the Appraisal Award. [#49 at ¶ 59]. Nor did he disclose other facts that would suggest a financial interest in the outcome of the appraisal, i.e., that he was a shareholder, owner, or otherwise retained a legal or equitable

ownership interest in Power Adjusters [*id.* at ¶ 61] and that he shared common business interests with Mr. Coutu as his *de facto* business partner [*id.* at ¶ 63]. Taking Plaintiff's factual contentions as true, the appointments of Messrs. Bensusan and Kezer as "impartial" under the Policy were statements that purported to tell the whole truth but did not, thereby creating a duty to disclose the necessary information regarding the Defendants' financial interests in the transaction to prevent these statements from being misleading. RESTATEMENT (SECOND) OF TORTS § 551(2)(b) cmt. g (AM. LAW INST. 1977); *accord* Colo. Civ. Jury Instr., Civil 19:5(2)–(4) (finding a duty to disclose when the defendant states some, but not all material facts, knowing that it would create a false impression in the plaintiff's mind; when the defendant knew her deceptive conduct would create a false impression of the actual facts in the plaintiff's mind; or when the defendant knew the plaintiff was not in a position to discover the facts for herself).

### c. Customs of the Trade

Similarly, this court concludes that Defendants had a duty to disclose based on a reasonable expectation of disclosure under the customs of the trade and objective circumstances. RESTATEMENT (SECOND) OF TORTS § 551(2)(e) (AM. LAW INST. 1977). First, Defendants impartiality (or lack thereof) is a fact basic to the transaction, as it goes to the essence of the appraisal process. *See id.* cmt. j (AM. LAW INST. 1977).

*Appraisers.* Next, Plaintiff relies upon the Colorado Division of Insurance Bulletin B-5.26 ("Bulletin B-5.26") in arguing that Mr. Bensusan and Atlantis Claims, as appraiser, had a duty to disclose their pecuniary interest in the Appraisal Award and any subsequent bad faith litigation against Church Mutual. *See* [#49 at ¶¶ 75–82]. Bulletin B-5.26 specifies that a "fair and competent" appraiser is one who is "not a party to the insurance contract" and has "no financial interest in the outcome of the appraisal," and "may not have a direct material interest in

the amounts determined by the appraisal process." Colo. Dep't of Regulatory Agencies, Div. of Ins., Bulletin No. B-5.26, Requirements Related to Disputed Claims Subject to Appraisal, at 2 (re-issued Oct. 26, 2015), https://perma.cc/3JC4-37HG. Defendants argue that Bulletin B-5.26 cannot form the basis of a duty to disclose, because it is not Colorado law, is nonbinding, is inapplicable to Defendants, and erroneously incorporates the Colorado Uniform Arbitration Act ("CUAA") into non-arbitration proceedings. *See* [#65 at 21–23; #110 at 9]. While true that several courts in this District have found the CUAA inapplicable to appraisal proceedings, *see, e.g.*, *Montview Boulevard Presbyterian Church v. Church Mut. Ins. Co.*, No. 14–CV–01635–MSK–KMT, 2016 WL 233380, at *2–4 (D. Colo. Jan. 20, 2016) (collecting cases),[9] this court respectfully agrees with Plaintiff that Bulletin B-5.26 is an instructive guide for defining "impartial" appraisers and umpires, and for understanding the customs of the trade. [#95 at 20–21].

A division of the Colorado Court of Appeals entertained a similar challenge to an appraiser's impartiality based on the appraiser's failure to disclose that she was "partners" with the public adjuster. *Owners Ins. Co. v. Dakota Station II Condo. Assoc., Inc.*, --- P.3d ----, 2017 WL 3184568, at *3–4, *6–7 (Colo. App. Jul. 27, 2017). Though the division upheld the trial court's determination that the plaintiff failed to establish an impermissible relationship between the appraiser and public adjuster sufficient to vacate the appraisal award, it suggested that Bulletin B-5.26's provisions could be used as a standard governing impartial appraisers. *Id.* at *3 n.2. This conclusion is further bolstered by court decisions that reflect the expectation that appraisers who have a known, direct, and material interest in the outcome of the appraisal may not serve as an appraiser, and that an appraiser has a duty to disclose facts that a reasonable

---

[9] These cases reach this conclusion when an insured or insurer seeks to vacate the appraisal award pursuant to the CUAA or when a third-party seeks protection from discovery under the CUAA, issues not applicable here.

person would consider likely to affect his or her impartiality. *Auto-Owners Ins. Co. v. Summit Park Townhome Assoc.*, No. 14-cv-3417-LTB, 2016 WL 1321507, at *1 (D. Colo. Apr. 5, 2016).

As explained, Claim II does not merely allege that Defendants favored Montview over Plaintiff but, rather, that Defendants intentionally concealed their pecuniary interests in this specific Appraisal Award and the Underlying Litigation to Plaintiff's detriment. *See Owners Ins.,* 2017 WL 3184568 at *3 (holding that an impartial appraisal may favor one side more than the other, but must be unbiased and unswayed by personal financial interest). Defendants do not point this court to any persuasive authority to suggest that the customs of the trade do not require appraisers to disclose if they have direct pecuniary interests in the outcome of the particular appraisal. Indeed, the *Summit Park* court noted that a pecuniary interest in the outcome of an appraisal goes beyond "the mere 'retention of an expert on multiple engagements.'" *Summit Park*, 2016 WL 1321507, at *5.

*Public Adjusters.* The question as to any duty attaching to Mr. Coutu and Power Adjusters as public adjusters is more difficult, but ends with the same conclusion. As an initial matter, this court recognizes that public adjusters are hired to advocate on behalf of an insured. That agency, however, does not absolve the public adjuster of duties to others apart from the insured. At oral argument, counsel for Mr. Coutu and Power Adjusters suggested that a public adjuster was akin to an attorney on a contingency fee basis who had no duty to the opposing side. [#119 at 14:19–15:7]. This court finds this analogy apt, but from a different perspective than counsel. While an attorney has a duty to zealously advocate for his client, he simultaneously has ethical obligations that are reflected in the District's Local Rules of Practice for Attorneys, *see e.g.*, D.C.COLO.LAttyR 2, and Rules 11 and 26 of the Federal Rules of Civil Procedure. Indeed, an attorney generally cannot acquire a proprietary interest in the cause of action or subject matter

of the litigation; a contingent fee (the example used by defense counsel) is a specific delineated exception. Colo. R. Prof. Conduct, Rule 1.8(h) & cmt. Here, the public adjuster's duties regarding the disclosure of financial interests in the specific Appraisal Award and/or bad faith litigation derive, in part, from the customs of the trade.

While this court agrees with Defendants that Colo. Rev. Stat. § 10-2-417 itself cannot create a duty to disclose in this case given that this statute became effective *after* the appraisal process, this court nevertheless finds the statute supportive of its conclusion that the customs of the trade reflected a duty to disclose under the circumstances. Colo. Rev. Stat. §§ 10-2-417(6)(h) and (i)(II) prohibit a public adjuster from engaging in activities that may reasonably be construed as presenting a conflict of interest; having a financial interest in any firm that obtains business in connection with any claim the public adjuster has a contract to adjust; or from making material misrepresentations intended to injure any person engaged in the business of insurance. These obligations reflect an expectation in the industry that, while an advocate for the insured, the public adjuster is still expected to avoid conflicts of interests.

This court also finds support in comment *l* of section 551(2). Comment *l* provides, in pertinent part,

> There are situations in which the defendant not only knows that his bargaining adversary is acting under a mistake basic to the transaction, but also knows that the adversary, by reason of the relation between them, the customs of the trade or other objective circumstances, is reasonably relying upon a disclosure of the unrevealed fact if it exists. In this type of case good faith and fair dealing may require a disclosure.
> . . .
> In general, the cases in which the rule stated in Clause (e) has been applied have been those in which the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware.

RESTATEMENT (SECOND) OR TORTS § 551(2)(e) cmt. *l* (AM. LAW INST. 1977). The FAC alleges that neither Plaintiff nor Montview knew of Mr. Bensusan's financial interest in the Appraisal Award prior to the appraisal panel's decision; that Messrs. Coutu and Bensusan had an undisclosed compensation agreement that linked Mr. Bensusan's compensation to a percentage of the Appraisal Award; that the Appraisal Award itself was "tainted and corrupted" because of Defendants' nondisclosures; that Defendants stood to benefit financially from the underlying Montview litigation; and that Defendants have allegedly perpetrated this scheme in several different cases. *E.g.*, [#49 at ¶¶ 33–35, 45, 49–54, 58, 59–67, 94–96, 111–19].

This court respectfully concludes that under the circumstances, good faith and fair dealing required disclosure of Defendants' financial arrangements affecting the particular Montview insurance claim and subsequent bad faith litigation. Additionally, that Plaintiff adequately alleges in the FAC that Defendants exploited Plaintiff's ignorance to a significant degree to state a cognizable fraudulent concealment claim. RESTATEMENT (SECOND) OR TORTS § 551(2)(e) cmt. *l* (AM. LAW INST. 1977); *cf. Montview Boulevard Presbyterian Church v. Church Mutual Insurance Co.*, No. 14-cv-01635-MSK-KMT, [ECF. 138 at 30:3–12 ("It looks like Mr. Bensusan or his companies have some kind of an interest in the resolution of the claim, and that's not proper. . . . How can [Mr. Kezer] be an attorney for the public adjuster and say [he's] a disinterested umpire? . . . that's kind of mind-boggling."), 87:8–19, 88:14–18 ("[T]here's at least $49,000 worth of remuneration that was provided to Mr. Bensusan that nobody knew about during this period of time, by Mr. Coutu who has an admitted stake in the recovery from the insurance company.")].

Lastly, this court finds persuasive *Bayview Loan Servicing, LLC v. Boland*, 727 F. Supp. 2d 1065 (D. Colo. 2010). In *Bayview*, the plaintiff was the assignee of loans issued to various

buyers who purchased condominiums in an office complex. *Id.* at 1068. Several of these buyers defaulted on their loans and, in addition to suing the buyer-defendants, the plaintiffs also alleged claims against the seller-defendants (i.e., the owners of the complex), including fraudulent concealment. *Id.* The basis of the plaintiff's fraudulent concealment claim was that the seller-defendants entered into an agreement with Danny DeGrande whereby Mr. DeGrande would solicit individuals to purchase the condominiums. *Id.* Pursuant to this agreement, the seller-defendants were to receive a total of $8,500,000 for all units (based on a minimum price per square foot of each unit), regardless of what the buyers actually paid for the unit. *Id.* at 1069. Accordingly, Mr. DeGrande was entitled to any proceeds received over the minimum per square foot amount, and received roughly $2,483,389.52 in "Courtesy Payments." *Id.* The buyers were never informed of the agreement between the seller-defendants and Mr. DeGrande and were unaware of Mr. DeGrande's role in the sales transactions; nor were the lenders (the plaintiff's assignors) aware of the agreement and "assumed and relied on the existence of an arms' length negotiation in determining what effect to give the parties' agreed-upon price in determining the properties' value." *Id.* at 1069–70, 72. Representatives of the lenders testified that they wanted to know about the agreement between the seller-defendants and Mr. DeGrande, i.e., that the seller-defendants were to receive a set minimum price for the units, and that Mr. DeGrande sought buyers to purchase at or in excess of the minimum. *Id.* at 1072.

The seller-defendants moved for summary judgment on the plaintiff's fraudulent concealment claim, because they had no duty to disclose their agreement and relationship with Mr. DeGrande. *Id.* at 1072–73. This was because the seller-defendants had no communications and/or relationship with the lenders (the plaintiff's assignors) to trigger any duty to disclose. *Id.* at 1073. The court disagreed, finding that genuine issues of material fact existed as to whether

the seller-defendants had a duty to disclose their agreement with Mr. DeGrande. Specifically, the sales contracts, prepared pursuant to the seller-defendants' direction, each listed Mr. DeGrande as a "Transaction-Broker," and provided a section for broker compensation and which party bore the responsibility of paying that compensation. The court held that "it is apparent that there is a custom of the trade to disclose compensation arrangements of the broker." *Id.* at 1073. However, genuine issues of material fact existed "as to whether DeGrande truly acted as a neutral transaction broker, or in reality acted on behalf of the sellers[,]" and that "there are also questions as to whether the true nature of his remuneration and incentives were disclosed." *Id.* Accordingly, the court denied summary judgment because if the sales contracts were misleading, the seller-defendants may have had a duty to disclose the true facts to the lenders who relied on that misleading information. *Id.*

A similar situation exists here. The FAC alleges that Defendants had an agreement whereby Mr. Bensusan would receive a percentage of the Appraisal Award as compensation for being the appraiser rather than receive an hourly fee. *See* [#49 at ¶ 33]. Similarly, that Messrs. Bensusan and Coutu had an agreement whereby they would be entitled to a portion of damages issued to a policyholder in a bad-faith lawsuit against the insurer. [*Id.* at ¶ 35]. The FAC continues that Montview hired Mr. Coutu who then appointed Mr. Bensusan as the appraiser, and that Montview at the time was unaware of Mr. Bensusan's contingency fee agreement. [*Id.* at ¶¶ 19, 24, 33–34]. Importantly, the FAC alleges that Church Mutual was unaware of the Defendants' financial and business relationships as well as their pecuniary interests in an inflated Appraisal Award, but relied on the assumption that Mr. Bensusan was indeed an impartial appraiser. *See generally* [*id.*]. And, as was the case in *Bayview*, Defendants assert that they owed no duty to Plaintiff because they were dealing solely with Montview. However, this court

concludes, as did the court in *Bayview*, that this fact does not insulate Defendants from potential liability. Rather, if the facts alleged are taken as true, Defendants, as parties to the appraisal process, failed to disclose to Plaintiff their financial and business interests in the Appraisal Award (and in the subsequent litigation between Montview and Plaintiff), which created a false impression that Mr. Coutu had selected Mr. Bensusan as an impartial appraiser. A misconception Church Mutual allegedly relied on to its detriment. *See Bayview*, 727 F. Supp. 2d at 1073 (explaining that a party to a transaction has a duty to disclose material information if she has stated facts that she knows will create a false impression unless disclosed).

Thus, this court respectfully concludes that Defendants owed Plaintiff a duty to disclose financial arrangements that reflected a pecuniary interest in the outcome of the Appraisal Award and bad faith litigation.[10] This court now turns to Defendants' alternate argument for dismissal.

---

[10] Briefly, this court touches on Plaintiff's additional argument that Defendants had a duty to disclose based on Colo. Rev. Stat. § 10-1-128(1), which seeks to combat the growing problems associated with insurance fraud. Colo. Rev. Stat. § 10-1-128(2)(a)–(b). The statute defines "a fraudulent insurance act" as any intentional act to defraud an insurer regarding, *inter alia*, a claim for benefits under an insurance policy where the person presents, prepares, or has knowledge that a written statement contains false information concerning any material fact. *See id.* § 10-1-128(1). Arguably, the FAC alleges that Defendants committed insurance fraud. However, based on this court's review of the entire statutory language, there is no unambiguous or unequivocal duty imposed on Defendants to generally disclose their financial and business relations to Plaintiff. *Cf. Sussman*, 143 F. Supp. 2d at 1236–40 (dismissing the plaintiffs fraudulent concealment claim, because Colorado's non-agent real estate broker statute did not create a duty on a transaction-broker to disclose that property priced by the seller has risen in value above the asking price); *accord Barfield v. Hall Realty, Inc.*, 232 P.3d 286, 292 (Colo. App. 2010) (dismissing the plaintiff's fraudulent concealment claim because a transaction-broker has a duty to disclose only material facts that she actually knows under Colorado statutes). Nor is it entirely clear that this statute creates a private cause of action or whether it is regulatory in nature. *See Wagner v. Travelers Prop. Cas. Co. of Am.*, 209 P.3d 1119, 1129 (Colo. App. 2008) (explaining that Colo. Rev. Stat. § 10-3-1104(1)(a)(I), regulating insurance companies, cannot be the basis of a private right of action); Colo. Rev. Stat. § 10-1-128(2)(b). Lastly, Plaintiff's reliance on *Flores v. Am. Pharm. Servs., Inc.*, 994 P.2d 455, 459 (Colo. App. 1999) is misplaced, as that case held that the plaintiff could maintain her retaliatory discharge in violation of public policy claim on the basis that she reported a co-workers alleged insurance fraud. *Flores* does not support the proposition that Defendants owed a duty to disclose based on Colo. Rev. Stat. § 10-1-128(1).

### C.    Economic Loss Rule

As mentioned, Defendants also move to dismiss Claim II because any duty Defendants owed to Plaintiff arose from the Policy; thus, the economic loss rule bars Claim II.  For the following reasons, this court respectfully disagrees.

Pursuant to Colorado's economic loss rule, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000) (footnote omitted).  "A duty independent of contractual provisions may arise in the context of a special relationship, for example, and some tort claims seeking to remedy economic loss can arise independently of a breach of contract claim." *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1241 (10th Cir. 2014) (citing *Town of Alma*, 10 P.3d at 1263).  That is, the duty must arise from general tort law duties "to protect citizens from risk of physical harm or damage to their personal property," not obligations based on bargained-for exchanges.  *See In re Estate of Gattis*, 318 P.3d 549, 553 (Colo. App. 2013) (internal quotation marks and citations omitted).  The inquiry thus focuses on the source of the duty that the defendants allegedly breached; three factors are relevant to the court's consideration:  (1) whether the tort relief sought is the same as the contractual relief; (2) whether there is a recognized common law duty in tort; and (3) whether the tort duty is distinct from the contractual duty.  *See Electrology Lab., Inc. v. Kunze*, 169 F. Supp. 3d 1119, 1152 (D. Colo. 2016) (citing *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 74 (Colo. 2004)).

Defendants argue that the economic loss rule bars Claim II because, despite Defendants being a "stranger" to the Policy, they were parties to an interrelated series of contracts that allocated the risks, duties, and remedies amongst the Parties.  [#65 at 15–16; #110 at 16–17].

Specifically, the duty to appoint an "impartial appraiser" arose from the Policy and the Policy provided Church Mutual its sole form of relief for any concealment, misrepresentation, or fraud, i.e., the right to deny Montview's claim—a remedy Plaintiff sought to utilize in the underlying Montview litigation. [#65 at 17–18; #110 at 16]. However, this court respectfully concludes that Claim II properly asserts that Defendants breached a duty owed to Plaintiff independent of the Policy or any interrelated contract.

In *BRW, Incorporated v. Dufficy and Sons, Incorporated*, the Colorado Supreme Court held that "the economic loss rule applies when the claimant seeks to remedy only an economic loss that arises from interrelated contracts." 99 P.3d at 72; *see also Town of Alma*, 10 P.3d at 1264 n.12 (extending the economic-loss rule to third-party beneficiaries who may have a cause of action for breach of contractual duties). The Colorado Supreme Court explained that construction projects were multi-party transactions, consisting of "a complex set of interrelationships, and respective rights and obligations." *Id.* (citation omitted) ("Even though a subcontractor may not have the opportunity to directly negotiate with the engineer or architect, it has the opportunity to allocate the risks of following specified design plans when it enters into a contract with a party involved in the network of contracts."). Ultimately, the Colorado Supreme Court held that the economic loss rule barred Dufficy's negligence and negligent misrepresentation claims against its subcontractor BRW and its agent, because Dufficy predicated both claims on a breach of duty contained within the interrelated contracts, i.e., that BRW and its agent breached their duties of care that were explicitly referenced in their respective contracts. *Id.* at 74–75.

Here, however, Defendants identify no interrelated contract that defines the duty of care allegedly owed to Plaintiff. *See SK Peightal Eng'rs, Ltd. v. Mid Valley Real Estate Sols. V, LLC*,

342 P.3d 868, 872 (Colo. 2015) ("Therefore, absent an independent tort duty, a plaintiff is generally barred from suing in tort if . . . [a] contract defines the duty of care that the defendant allegedly violated or is interrelated with another contract that defines that duty of care."). Rather, Defendants rely solely on the Policy's provision that "each party will select a competent and impartial appraiser." *See* [#65 at 17–18; #110 at 16]. However, aside from this language, the Policy appears to be silent as to any duty an impartial appraiser owes. For example, in *Former TCHR, LLC v. First Hand Management LLC*, a division of the Colorado Court of Appeals held that the economic loss rule barred the plaintiff's fraudulent concealment claim relating to a real estate sales agreement for a shopping center. 317 P.3d 1226, 1228 (Colo. App. 2012); *see also Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 291–93 (Colo. App. 2009) (holding that the economic loss rule precludes fraudulent concealment claims that arise from duties implicated by the contract and relate to the performance of that contract). The plaintiff alleged that, before closing on the agreement, agents for the seller fraudulently concealed the fact that the shopping center's anchor tenant was "substantially indebted" to a creditor and consistently behind in its rent payments. *Id.* at 1232. The division held that the economic loss rule barred the plaintiff's fraudulent concealment claim, because the real estate sales agreement expressly detailed the applicable disclosure duties, and the plaintiff's claim "arose from and were expressly described by that Agreement, or were subsumed within that Agreement's implied covenant of good faith and fair dealing." *Id.* (citing *Hamon*, 229 P.3d at 293–94). The division emphasized that the duty to refrain from fraudulent concealment existed solely because of the real estate sales agreement and, therefore, did not constitute an independent duty. *Id.*

This case is distinguishable for several reasons.  First, as explained, the Policy does not set forth the disclosure duties Plaintiff seeks to enforce, nor are these duties subsumed in any interrelated agreement that is before this court.  Next, while it could be argued that Defendants' duties arise solely from the Policy, Defendants (as they have vigorously contended) were not parties to the Policy; rather, the Policy imposed a duty on Montview to nominate an impartial appraiser, which it believed it did.  Accordingly, a tort claim against Defendants does not first require this court to determine whether Defendants breached their contract with *Plaintiff*.  *See Makoto USA, Inc. v. Russell*, 250 P.3d 625, 628 (Colo. App. 2009) (holding that the economic loss rule barred the plaintiff's civil theft claim, because the "theft claim could not have been proven without first proving that defendants also breached their contract with plaintiff."). Further, neither the Policy nor any interrelated agreement disclaims Plaintiff's reliance on Defendants' nondisclosures regarding their partiality, and the Policy provides only general remedies against <u>Montview's</u> concealment, misrepresentations, or fraud, not any remedies against Defendants for their tortious conduct.  *See In re Estate of Gattis*, 318 P.3d at 556 (distinguishing *Former TCHR, LLC* and *Hamon*, and declining to extend the economic loss rule to form contracts that do not (1) set out a standard of care, (2) limit rights to specific disclosures, or (3) provide express remedies for nondisclosure).  And while Plaintiff could, and did, proceed against Montview based on the alleged misdeeds of its public adjuster and the appraiser selected by the public adjuster, the case law suggests that an innocent insured might not be precluded from recovering under a policy.  *Cf. Republic Ins. Co. v. Jernigan*, 753 P.2d 229 (Colo. 1988) (en banc).  Accepting Defendants' various contract arguments would leave Plaintiff with no recourse for Defendants' alleged misconduct.

Based on the foregoing, this court concludes that Claim II alleges that Defendants breached a duty owed independent of the Policy, and that the economic loss rule therefore does not bar Claim II. Accordingly, this court respectfully RECOMMENDS that Defendants' Motion to Dismiss be DENIED as to Claim II.

## II.     Civil Conspiracy – Claim I

To maintain a civil conspiracy claim against Defendants, Plaintiff must allege that (1) Defendants; (2) had an object to be accomplished, i.e., fraudulently conceal their financial and business relationship; (3) the conspirators had a meeting of the minds on the object or course of action; (4) the conspirators took an unlawful overt act; and (5) the conspirators caused Church Mutual damages as a proximate result. *See Sender v. Mann*, 423 F. Supp. 2d 1155, 1179 (D. Colo. 2006). However, this "court will not infer the necessary agreement. Facts showing such an agreement must be alleged by the plaintiff." *F.D.I.C. v. First Interstate Bank of Denver*, N.A., 937 F. Supp. 1461, 1473 (D. Colo. 1996) (citing *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995)). And, as noted, conspiracy is a derivative cause of action that is not independently actionable absent some underlying wrongful conduct. *See Sterenbuch v. Goss*, 266 P.3d 428, 435 (Colo. App. 2011) (explaining, "it is wrongful acts, not the mere existence or continuation of a conspiracy, that injure the plaintiff.").

Defendants move to dismiss Claim I because the absence of a duty to disclose under Claim II negates an underlying wrong, which is fatal to Plaintiff's derivative claim for civil conspiracy. *See* [#65 at 23; #110 at 4]. However, given this court's conclusion *supra*, Defendants' argument is unavailing. Accordingly, this court respectfully RECOMMENDS that Defendants' Motion to Dismiss be DENIED as to Claim I.

### III.     RICO & RICO Conspiracy – Claims III & IV

RICO allows private parties to bring civil actions for treble damages for violations of sections 1962(c) and (d).  *See* 18 U.S.C. § 1964(c).  "To state a RICO claim, a plaintiff must allege that the defendant violated the substantive RICO statute, 18 U.S.C. § 1962[(c)], by setting forth four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Deck v. Engineered Laminates*, 349 F.3d 1253, 1256–57 (10th Cir. 2003) (internal quotation marks and citations omitted).  "Pursuant to § 1962(d), conspiracy to commit a RICO violation also constitutes a violation of the Act when a conspirator adopts the goal of furthering the enterprise, even if the conspirator does not commit a predicate act."  *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1088 (10th Cir. 2014) (citation omitted).  However, a plaintiff only has standing to allege a RICO claim if its injuries were proximately caused by the RICO violation.  *See Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010).[11]

Defendants move to dismiss Claims III & IV because the FAC fails to allege a RICO violation, a fact that necessarily dooms any RICO conspiracy claim.  [#65; #110].  As to Claim III, Defendants argue that Plaintiff fails to plead racketeering activity (wire/mail fraud) with particularity under Rule 9(b), a "pattern" of racketeering activity, an "enterprise", or an injury proximately caused by a RICO violation.  [#65 at 25–33; #110 at 17–22].  Because this court

---

[11] There appears to be some ambiguity as to whether the question of RICO standing is a jurisdictional matter.  *Compare Bixler*, 596 F.3d at 756 (considering RICO standing under Rule 12(b)(6)); *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006) (same) *with Ivar v. Elk River Partners, LLC*, 705 F. Supp. 2d 1220, 1231–32 (D. Colo. 2010) (indicating that RICO standing is jurisdictional).  However, the weight of authority in this Circuit appears to treat the inquiry as one more appropriately analyzed under Rule 12(b)(6), consistent with other Circuits.  *See, e.g.*, *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 116–17 (2d Cir. 2003) (holding that RICO standing is properly considered under Rule 12(b)(6), because the inquiry is "sufficiently intertwined with the merits of the RICO claim") *abrogation on other grounds recognized by American Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352 (2d Cir. 2016).

agrees that Plaintiff's failure to plead a pattern of racketeering activity necessitates dismissal, it focuses on this argument.

### A.  Racketeering Activity & Pattern of Racketeering Activity

"'RICO is founded on the concept of racketeering activity.  The statute defines 'racketeering activity' to encompass dozens of state and federal offenses, known in RICO parlance as predicates.  These predicates include any act 'indictable' under specified federal statutes,'" including mail and wire fraud, 18 U.S.C. §§ 1341, 1343.  *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 882 (10th Cir. 2017) (quoting *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2096 (2016)).  A "pattern of racketeering activity" requires at least two predicate acts.  *See Gillmor v. Thomas*, 490 F.3d 791, 797 (10th Cir. 2007).  This requires a showing of a relationship between the predicate acts and a threat of continuing activity—"the pattern element is not satisfied by a showing of relatedness alone."  *Duran v. Carris*, 238 F.3d 1268, 1271 (10th Cir. 2001).

To state plausible mail and wire fraud claims, Church Mutual must allege "the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and that [Defendants] communicated, or caused communications to occur, <u>through the U.S. mail or interstate wires to execute the fraudulent scheme</u>."  *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016) (emphasis added) (internal quotation marks and citation omitted).  Further, Plaintiff's claims for mail and wire fraud must meet the heightened pleading burden under Rule 9(b) of the Federal Rules of Civil Procedure.  *Internet Archive v. Shell*, 505 F. Supp. 2d 755, 768 (D. Colo. 2007).  That is, the FAC "must set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof. . . . [And] must also identify the purpose of the mailing [or use of the

wires] within the defendant[s'] fraudulent scheme." *See Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006) (internal quotation marks, brackets, and citations omitted). And, as mentioned, Plaintiff must identify at least two predicate acts of mail and/or wire fraud. *See George*, 833 F.3d at 1254 (noting, "while two acts are necessary, they may not be sufficient to establish a pattern." (internal quotation marks and citation omitted)).

Defendants argue that Church Mutual fails to plead mail or wire fraud with particularity as required under Rule 9(b). [#65 at 26; #110 at 18]. Specifically, the only allegation that could constitute the use of mail or interstate wires to perpetuate fraud is the allegation that *Montview* sent the Appraisal Demand via email; there is no allegation as to Defendants. [#65 at 26–27; #110 at 18–19]. Rather, Plaintiff's allegations regarding mail or wire fraud are entirely conclusory and lack the requisite specificity. [#65 at 27–28; #110 at 19–22].

As relevant here, the FAC alleges, "Montview named Bensusan, of Atlantis Claims, to serve as its purportedly impartial appraiser[] . . . via email (an interstate wire), to Church Mutual's outside adjuster." [#49 at ¶ 24]. Church Mutual received the Appraisal Demand on January 31, 2013. [*Id.* at ¶ 25]. The FAC continues with several allegations that Defendants "engaged in similar fraud via concealment or non-disclosure in numerous other Colorado bad faith cases," a list of several cases involving Defendants, and that in "each of these instances [Defendants] furthered their scheme using the U.S. Mail, interstate carriers, and/or interstate wire. . . . Bensusan and Coutu were aware that the mail and/or wire communications . . . conveyed the implicit false impression that Bensusan was impartial." [*Id.* at ¶¶ 94, 96, 129–130]. Again, Plaintiff points to the Appraisal Demand sent via email in support of its wire fraud claim. [*Id.* at ¶ 130]. Plaintiff asserts that these allegations sufficiently plead racketeering activity with particularity. [#95 at 37–38]. Though a close call, this court respectfully agrees.

The FAC pleads only one use of an interstate wire, i.e., the Appraisal Demand nominating Mr. Bensusan sent via email by Montview to Church Mutual's public adjuster. *See* [#49 at ¶¶ 24, 130]. Many of Plaintiff's surrounding allegations of mail and wire fraud are conclusory and speculative. *See, e.g.*, [#49 at ¶¶ 97–104, 128–131]. Nevertheless, it is true that "deceitful concealment of material facts *may* constitute actual fraud." *See United States v. Gallant*, 537 F.3d 1202, 1228 (10th Cir. 2008) (emphasis added). And, that a perpetrator may be guilty of mail or wire fraud without personally effecting the mailing or wiring if she "does an act with knowledge that the use of mail [or wire] will follow in the ordinary course of business, or where such use can reasonably be foreseen," though not actually intended. *See United States v. Washington*, 634 F.3d 1180, 1183–84 (10th Cir. 2011). Plaintiff alleges that the nomination of Mr. Bensusan as an impartial appraiser via interstate wire was a critical piece in Defendants fraudulent scheme, as Defendants concealed Mr. Bensusan's partiality, which then led to an "inflated and corrupted" Appraisal Award and a deceitful bad-faith lawsuit by Montview against Plaintiff for Defendants financial benefit. Based on the FAC's factual allegations, this court concludes that Plaintiff sufficiently identified the "who, what, when, where and how of the alleged fraud." *Snyder v. ACORD Corp.*, No. 14-cv-01736-JLK, 2016 WL 192270, at *4 (D. Colo. Jan. 15, 2016) (internal quotation marks and citation omitted); *but see Brooks v. Bank of Boulder*, 891 F. Supp. 1469, 1476–77 (D. Colo. 1994) ("The purpose of Rule 9(b) is to inhibit the filing of complaints as a pretext to discover unknown wrongs, to protect the defendant's reputation, and to give notice to the defendant regarding the complained of conduct. . . . In filing such serious allegations one may not shoot first and aim later."). While Montview's Appraisal Demand itself is not fraudulent, this court concludes that Defendants were at least on notice of

the basis for the mail and wire fraud claim, and that Plaintiff has pled this one instance with sufficient particularity. *See Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000).

However, this court respectfully agrees with Defendants that the FAC fails to plead a plausible pattern of racketeering activity. This is because the FAC contains only conclusory and speculative allegations as to similar instances of alleged mail or wire fraud. For example, the FAC alleges "on information and belief" that Defendants "have engaged in similar fraud via concealment or non-disclosure in numerous other Colorado bad faith cases, where Coutu was the public adjuster and Bensusan was named as the allegedly 'impartial' appraiser, when he was nothing of the sort." [#49 at ¶ 94]. The FAC proceeds to list seven (7) bad faith lawsuits where Mr. Coutu and Mr. Bensusan served as the insured's public adjuster and appraiser, respectively. [*Id.* at ¶ 96]. Plaintiff argues that this constitutes a pattern of racketeering activity, because the "victims are all insurance companies." [#65 at 39 (citing *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)]. But relatedness alone does not satisfy the pattern requirement. *See Duran*, 238 F.3d at 1271. The FAC must also allege either a "series of related predicates extending over a substantial period of time" or "a clear threat of future criminal conduct related to past criminal conduct." *See SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990).

Plaintiff attempts to demonstrate that in each of these other seven bad faith lawsuits Defendants committed the same predicate act, i.e., mail or wire fraud. But Paragraph 96, to which Plaintiff points to both in its papers and at oral argument [#119 at 33:16–34:13], lists only a series of cases in which Mr. Coutu was the public adjuster and Mr. Bensusan was "named" the appraiser. [#49 at ¶ 96]. Yet nothing in the FAC indicates *how* Mr. Bensusan was "named." [*Id.*]. In at least one case, Mr. Bensusan was withdrawn as the appraiser. [*Id.*]. As currently pled, Plaintiff's allegations merely establish Messrs. Coutu and Bensuan's involvement in bad

faith lawsuits. The FAC does not allege the underlying predicates in these related actions with specificity as required under Rule 9(b), but, instead, invites this court to infer that in each of these underlying actions, Defendants committed mail or wire fraud, which is insufficient. *See Tal*, 453 F.3d at 1267–68.

Additionally, there are no facts from which this court can determine that the lawsuits were necessarily related in that Plaintiff does not allege the circumstances giving rise to these actions and, again, invites this court to speculate that similar facts necessarily exist as to those seven bad faith lawsuits. Ultimately, the FAC alleges only similar bad faith lawsuits, but fails to establish the continuity of at least two predicate acts. To the extent that Plaintiff's counsel encouraged the court to look at attachments to its presentation that were not cited in or attached to the FAC, and were perhaps not previously disclosed, this court declines to do so, as its inquiry under Rule 12(b)(6) is limited to the allegations as pled within the four corners of the operative pleading, *see Garcia v. Johnson,* 64 F.3d 669 (10th Cir. 1995), and documents that are central to the pleading that are properly attached or identified. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). Therefore, this court respectfully RECOMMENDS that Claim III be DISMISSED.

## B. RICO Conspiracy

Defendants argue for dismissal of Claim IV because the failure to plead a plausible RICO violation necessarily precludes a claim for RICO conspiracy under § 1962(d). [#65 at 34]. This court respectfully agrees. "Our conclusion that plaintiffs have failed to allege any substantive violation of RICO disposes of their claim under subsection (d), because the object of a RICO conspiracy must be to violate a substantive RICO provision." *Schroder v. Volcker*, 864 F.2d 97, 98 (10th Cir. 1988) (internal quotation marks and citation omitted); *Kaplan v. Reed*, 28 F. Supp.

2d 1191, 1197 (D. Colo. 1998) (same). Accordingly, this court respectfully RECOMMENDS that Claim IV be DISMISSED.

## IV.    COCCA – Claim V

Pursuant to COCCA section 18-17-106(7), any person injured by violations of sections 18-17-104(3) or -104(4) may initiate a civil action to recover treble damages of the amount actually lost. Colo. Rev. Stat. § 18-17-106(7). "To properly allege a COCCA claim, Plaintiff[] must plead that [Defendants] plausibly participated in the affairs of an 'enterprise' through a pattern of two or more instances of racketeering activity." *Henson v. Bank of Am.*, 935 F. Supp. 2d 1128, 1136–37 (D. Colo. 2013) (citation omitted). A "pattern of racketeering activity" requires a showing that at least two acts of "racketeering activity," including mail and wire fraud, were committed by a member of the enterprise, and that those predicate acts of racketeering activity "relate[] to the conduct of the enterprise." *Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1125 (D. Colo. 2010) (internal quotation marks and citations omitted). If the predicate acts constitute fraud, Plaintiff must allege the circumstances of such fraud with particularity under Rule 9(b). *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1076 (D. Colo. 2012). "A conspiracy claim under COCCA requires an agreement to a pattern of racketeering activity and an agreement to the statutorily proscribed conduct. . . . Mere association with conspirators, even with knowledge of their involvement in a crime, is insufficient to prove participation in a conspiracy." *Sender*, 423 F. Supp. 2d at 1178 (internal quotation marks and citations omitted).

Here, given the relatedness between COCCA and RICO, Defendants move to dismiss Claim V for the same and/or similar reasons above. *See* [#65 at 34; #110 at 17–22]. Again, this court respectfully agrees with Defendants that Plaintiff fails to plead a plausible COCCA claim.

This is because, even if Plaintiff alleged a predicate act of wire fraud as it relates to this case, the FAC is devoid of specific factual allegations establishing a second predicate act committed by a member of the enterprise. *See People v. Chaussee*, 880 P.2d 749, 753, 758 (Colo. 1994) (holding "pattern of racketeering" under COCCA does not require proving continuity, but, rather, requires only a showing of two predicate acts that are related to the conduct of the enterprise); *accord Clementson v. Countrywide Fin. Corp.*, 464 F. App'x 706, 714 (10th Cir. 2012) ("Mr. Clementson's failure to allege two acts of racketeering activity is fatal to his COCCA claim."). Further, a failure to allege an underlying violation of COCCA precludes Plaintiff from maintaining a COCCA conspiracy claim under Colo. Rev. Stat. § 18-17-104(4). *See Henson*, 935 F. Supp. 2d at 1141. Thus, this court respectfully RECOMMENDS that Claim V be DISMISSED.

## V.    Leave to Amend

Finally, in its Response, Plaintiff seeks leave to amend its FAC a second time should the court find that its RICO and COCCA claims are not sufficiently alleged. [#95 at 43]. This court is disinclined to consider Plaintiff's request raised in its Response. *See* D.C.COLO.LCivR 7.1(d). Further, to the extent Plaintiff has the requisite information to amend its FAC as suggested at oral argument [#119 at 46:9–24], there is no attached proposed amended complaint for this court to make specific findings as to whether the proposed amendments would cure the shortcomings. *See Garman v. Campbell Cty. Sch. Dist. No. 1*, 630 F.3d 977, 986 (10th Cir. 2010) (upholding denial of leave to amend where the party failed to file a motion explaining the bases for any proposed amendment but merely included one line in a brief suggesting the possibility of amendment). Given the lack of information regarding any proposed amendment, and noting that Plaintiff has already amended once in this matter, this court is disinclined to

prejudge the sufficiency of such information, or to speculate as to the arguments that might be made by any Party regarding any proposed pleading. *See United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself.").

## CONCLUSION

For the reasons set forth herein, this court respectfully **RECOMMENDS** that:

(1)     Defendants' Joint Motion To Dismiss [#65] be **GRANTED IN PART and DENIED IN PART**;

        (a)     Claim I REMAIN;

        (b)     Claim II REMAIN;

        (c)     Claims III-V be DISMISSED; and

(2)     Any request by Plaintiff for leave to amend be **DENIED without prejudice**.[12]

---

[12] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED:  September 13, 2017

BY THE COURT:

s/Nina Y. Wang_____
United States Magistrate Judge